**Ervin L. NORMAN, Plaintiff,**

v.

**The DUVAL COUNTY SCHOOL BOARD et al., Defendants.**

**Civ. No. 72-881.**

United States District Court, M. D. Florida, Jacksonville Division.

July 9, 1973.

William H. Maness, Jacksonville, Fla., for plaintiff.

Ralph W. Nimmons, Jr., Asst. Counsel, City of Jacksonville, Jacksonville, Fla., for defendants.

## ORDER AND OPINION

CHARLES R. SCOTT, District Judge.

This civil rights case is now before this Court on the defendants' suggestion of abstention from the exercise of federal jurisdiction pursuant to 42 U.S.C. § 1983[1], filed herein February 23, 1973, a suggestion which the plaintiff, quite naturally, opposes on the ground that abstention would be inappropriate because of the serious federal claim herein presented.

For the reasons outlined below, this Court feels that abstention is particularly appropriate in this case, especially in the light of the recent United States Supreme Court cases of Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and Perry v. Sin-

1. Section 1983 reads as follows:
   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities, secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

dermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

## I. THE COMPLAINT

The allegations of the complaint are essentially as follows: On June 6, 1972, the director of certified personnel of the Duval County School Board, Ted E. Starnes, notified plaintiff by letter that the personnel screening committee had recommended that he was eligible for the position of community school coordinator; that his name had been added to the "list of approved candidates"; that the screening committee was "confident the training . . . (he had) had adequately prepare(d) . . . (him) to perform at a level of professional competency that will enhance the educational opportunities made available through this system"—and that it was "hoped . . . an early assignment . . . (could) be available" to him. On June 28, 1972, an annual contract was executed by the board's superintendent and the board chairman, and mailed to plaintiff, appointing him community school coordinator. On July 3, 1972, plaintiff executed the contract and embarked upon his official duties and continued to do so for nine days—through July 11th—when he was advised that the superintendent, on July 10th, had withdrawn his name from the list of personnel submitted to the board for "pro forma" approval, that his appointment was accordingly terminated forthwith and that he would be paid at the agreed salary rate through July 11th, only. The contract was withdrawn from the list of appointees recommended to the board for approval on the basis of certain secret matters communicated by defendant Dr. John D. Kennedy to defendant Buford H. Galloway, the board's director of evaluation and development, and by him to Dr. Hardesty, the school superintendent, during the period July 3rd–July 10th, 1972. Notwithstanding his demands, the nature and details of the communications were not fully disclosed to Norman. Plaintiff alleged that, in fact, the communications included certain charges that he had left his former employment at the sheriff's office "under a cloud" surrounding his alleged misconduct and disobedience at a student unrest incident at a local high school and that he had been asked to resign and had done so and that Dr. Hardesty, the school superintendent, would be embarrassed because of such "secret matters".

The thrust of Norman's constitutional claim is that his alleged contract with the board was a valuable property interest and, before he could be discharged therefrom, procedural due process required that he be given notice of the reasons for his discharge and an opportunity to refute them in a hearing before an impartial tribunal. Plaintiff claims that the charges "secretly" presented by defendant Kennedy were defamatory and that they foreclosed him from "all future employment in his field, including approval as a substitute teacher". In addition, he claims that the acts of Kennedy and Galloway were deliberately designed to impair his future professional status, thus subjecting them to liability to Norman for compensatory and punitive damages.

Aside from the claim for the damages for defamation and tortious interference with contract or prospective advantage, plaintiff seeks, *inter alia:* (1) to be reinstated with back pay and that his removal and reinstatement not be weighed prejudicially in determining whether his contract be renewed for another year; (2) to have expunged from his personnel record the "secret charges" lodged against him; and (3) to have this Court find that his removal violated his constitutional rights.

The essence of the suggestion of abstention is that this case involves an unsettled area of state law which must first be authoritatively settled by a Florida state tribunal, *i. e.,* before plaintiff's constitutional claim can be reached, the existence of a legally binding contract between the parties under state law, which has been controverted by the defendants, must first be established. Defendants contend that before any le-

gally binding employment contract exists, Florida law requires that the school board itself must formally approve the contract, citing Sections 230.33(7)(f)[2] and 230.23(5)[3] of the Florida Statutes, F.S.A., and that the superintendent was legally entitled to withdraw his recommendation for approval at any time prior to formal board action. Defendants further contend that the particular contractual claim herein present-

ed has never been authoritatively determined by a Florida court and that, if it is resolved in favor of plaintiff, he may obtain all the relief sought after in this Court in the state courts.

As far as procedural due process is concerned, defendants assert that the so-called "Duval County Teacher Tenure Act", Chapter 21197, Laws of Florida, 1941[4], as amended, which applies to discharges from existing teacher contracts,

---

2. Fla.Stat. § 230.33(7)(f), F.S.A., provides that one of the duties and responsibilities of a school superintendent, is to "[r]ecommend to the school board terms for contracting with employees and prepare such contracts as are approved. Contracts with the members of the instructional staff are to be prepared, recommended, and executed as hereinbefore prescribed. Authority is given to make appointments to approved positions and to approve compensation therefor at the rate provided in the currently established salary schedule, *pending action by the local board* at its next regular or special meeting". (emphasis added)

3. Fla.Stat. § 230.23(5), F.S.A., provides that one of the duties and responsibilities of the school board is to "[d]esignate positions to be filled, prescribe qualifications for those positions, and provide for the appointment, compensation, promotion, suspension, and dismissal of employees as follows, subject to the requirements of chapter 231:

   (a) *Positions and qualifications*—
   Act upon recommendations submitted by the superintendent for positions to be filled and for minimum qualifications for personnel for the various positions.
   (b) *Appointment of Noninstructional Personnel*—

   Act on the written recommendations submitted by the superintendent of persons to act as administrative, supervisory, technical . . . assistants . . . and all other noninstructional personnel and appoint persons to fill such positions. The term *"Act on the written recommendations" shall be interpreted to mean that the school board must consider the recommendations or nominations of the superintendent submitted as prescribed by law and may not reject such recommendations or nominations except for good cause.* . . . " (emphasis added)
   The case at bar involves a case where the recommendation was withdrawn prior

to formal board approval thus apparently foreclosing the need for having the board show good cause for rejection. In other words, the board was apparently never given the opportunity to make a formal rejection.

4. This Act provides, in part:

   . . . . . . .

   Section 2. During the probationary period of employment, any contract of employment with any teacher may or may not be renewed upon the nomination of the board of trustees of the School Tax District of said County, and *during such probationary period of employment a teacher may be discharged or demoted under any existing contract by the County Board of Public Instruction of said County, for any one or more of the causes enumerated in Section 4 of this Act, preferred, established and found to exist, as provided for in Section 5 of this Act.*

   . . . . . . .

   Section 4. Causes for the discharge or the demotion of a teacher shall be:
   (a) Immoral character or conduct, insubordination, or physical or mental incapacity to perform the duties of the employment.
   (b) Persistent violation of or willful refusal to obey the laws of the State of Florida or regulations adopted by authority of law, relating to the public schools or the public school system.
   (c) Excessive or unreasonable absence from the performance of duties imposed by the employment, or refusal or inexcusable failure to discharge the duties of such employment. .
   (d) Dishonesty while employed, chronic illness, or conviction of a felony, crime or any ordinance involving moral turpitude.
   (e) Professional incompetency as a teacher; provided however, no teacher shall be discharged or demoted for such cause of professional incompetency unless and until the following requirements shall have been met, which re-

provides for sufficiently elaborate hearing procedure[5] so as to comport with procedural due process requirements of notice and an opportunity to be heard.

quirements shall apply only to such cause of professional incompetency, to-wit:

(1) That the teacher be given a clear and detailed statement of the specific reasons on which the claim of incompetency is based.

(2) That at least one opportunity to transfer to a new school or location be afforded the affected teacher where the teacher asserts as a defense racial discrimination or prejudice, personality conflicts with superiors, or other subjective considerations directly related to the deficiencies charged.

(3) That prior to the institution of proceedings as hereinafter provided, a period of one year shall elapse during which such teacher shall be afforded the opportunity of specific in-service training to correct the alleged deficiencies and the teacher shall cooperate in undergoing such specific in-service training, or, at the election of the teacher, but only with the consent of the Superintendent of Schools and the approval of the Duval County School Board, such teacher alternatively may be paid a sum of money up to, but not to exceed, one year's salary at his or her current rate upon the acceptance of which sum of money, such teacher's tenure and employment rights under this act and any contract then existing between such teacher and the Duval County School Board shall be deemed terminated.

(4) All proceedings for discharge or demotion brought under this subsection 4 (e), shall conform to the procedural requirements of Chapter 120, Florida Statutes, except that the hearing examiner shall be a person selected from a list supplied by The American Arbitraters Association and all costs incurred in such proceedings for discharge or demotion shall be borne solely by the Duval County School Board.

(5) No teacher shall be deprived of employment or professional status but for specific causes established by law having a clear relation to the competence or qualification to each, proved by the weight of the evidence.

In all such cases the teacher shall enjoy the right to a speedy and public hearing, to be informed of the nature and cause of the accusation, to be confronted with accusing witnesses, to subpoena witnesses and papers, and the assistance of counsel. No teacher shall be called upon to answer any charge affecting his employment or professional status but upon probable cause, supported by oath or affirmation.

(6) Provided however, notwithstanding any provision to the contrary, a teacher may waive the procedural safeguard hereinabove set forth, including, but not limited to, the year's delay and in-service training, and be promptly afforded a hearing as otherwise provided in this law.

5. Sections 5 through 7 provide as follows:

Section 5. Before any teacher shall be discharged from his or her employment after the completion of a probationary period of employment by such teacher, charges in writing against such teacher specifying one or more of the causes specified in Section 4 of this Act shall be preferred by the Board of Trustees of the school district in which said teacher is employed or by the County Superintendent of Public Instruction of said County and a copy thereof shall be delivered or mailed such teacher at his or her last post office address, with a notice of the time and place when a hearing upon such charge or charges will be held by the County Board of Public Instruction of said County not less than ten days prior to such hearing. At the time and place specified in such notice, the County Board of Public Instruction shall conduct a public hearing on such charge or charges, (unless the teacher desires a private hearing), at which hearing there shall be first presented the evidence in support of such charge or charges and thereafter the evidence on behalf of such teacher with respect thereto. At such hearing, the teacher shall have a right to be heard and represented by counsel. Only evidence under oath or affirmation shall be received at such hearing, and both the Board of Public Instruction of said County and the teacher shall have the right to subpoena for the attendance of witnesses at such hearing, to be issued upon application by the Clerk of the Circuit Court of said County. Full cross-examination of all witnesses shall be permitted, and the hearing shall be confined to the written charges served upon the teacher. A finding by a majority vote of the County Board of Public Instruction of said County that any one or more of the charges made have been sustained by the evidence shall be essential to and sufficient to sustain the same, and without such finding the charges preferred shall be ordered dismissed by said County Board. The said Board shall deliver a

In addition, Section 10 of the Act provides a discharged teacher with the right to enforce his rights under the Act in a Florida Circuit Court by a mandamus action. Finally, the defendants contend the claim for compensatory and punitive damages against defendants Galloway and Kennedy can be adequately resolved in the state courts in an action based upon malicious or tortious interference with contract.

In the light of the trend of abstention cases initiated by Railroad Commission of Texas v. Pullman Company, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), over 30 years ago, this Court finds that defendants' argument is persuasive and that abstention is particularly appropriate in this case.

## II. THE PULLMAN DOCTRINE AND ITS PROGENY

In the *Pullman* case, *supra*, the Pullman Company sought to enjoin enforcement of an order of the Texas Railroad Commission on the basis that the order denied its rights under the Fourteenth Amendment and also on the basis that the commission lacked authority to make the order in question, the latter contention involving an unsettled question of Texas law. The Court ordered the lower court to abstain from deciding the case but to retain jurisdiction until the parties had an opportunity to obtain a state court adjudication on the merits of the state claim involved. It cannot be said

that the basis of the decision was the insubstantiality of the federal claim. In fact, the Texas Railroad Commission order involved in that case required all sleeping cars to be in the charge of pullman conductors, all of whom were white (as opposed to pullman *porters*, all of whom were black), a seemingly patent example of racial discrimination and thereby unquestionably constitutionally infirm. In mandating abstention, the Court clearly disregarded the importance of the constitutional question raised therein:

> The complaint of the Pullman porters undoubtedly tendered a substantial constitutional issue. It is more than substantial. It touches a sensitive area of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open. *Such constitutional adjudication plainly can be avoided if a definitive ruling on the state issue would terminate the controversy.* 312 U.S. at 498, 61 S.Ct. at 644. (emphasis added)

The rationale of the *Pullman* doctrine is to prevent "needless friction" between the two jurisdictional spheres and to prevent a premature forecast of unsettled state law by a federal court:

> In this situation a federal court of equity is asked to decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication. (citing cases) The reign of

copy of its findings upon said charges to the teacher within forty-eight hours after the same have been made by said Board. The County Board of Public Instruction shall cause to be made, filed and preserved in its office a written transcript of all the evidence submitted at the hearing. The County Board of Public Instruction shall cause a copy of such transcript of the evidence to be made and delivered to such teacher without cost to him or her, within five days after the completion of the hearing when the finding is adverse to such teacher.

Section 6. If, upon the hearing provided for in Section 4 of this Act, there shall be a finding that any one or more of the charges made against such teacher is es-

tablished, such decision may be reviewed upon certiorari by the Circuit Court of Duval County. No such writ of certiorari shall be issued unless applied for within ten days after the finding by the Board of Public Instruction upon the charge or charges made, and the delivery to the teacher of a copy thereof and of a transcript of the evidence taken at the hearing. Section 7. If any finding by the County Board of Public Instruction be reversed or dismissed by the Circuit Court upon writ of certiorari, then such teacher shall be forthwith reinstated in his or her employment, and the same shall continue as though such charge or charges had not been preferred.

law is hardly promoted if an unnecessary ruling of a federal court is thus supplanted by a controlling decision of a state court. The resources of equity are equal to an adjustment that will avoid the waste of a tentative decision as well as the friction of a premature constitutional adjudication. 312 U.S. at 500, 61 S.Ct. at 645.

As in the case at bar, the plaintiffs in *Pullman* could be afforded full relief by the state court without ever having to reach the constitutional question:

> Regard for these important considerations of policy in the administration of federal equity jurisdiction is decisive here. If there was no warrant in state law for the Commission's assumption of authority there is an end of the litigation, the constitutional issue does not arise. The law of Texas appears to furnish easy and ample means for determining the Commission's authority. . . . Or, if there are difficulties in the way of this procedure of which we have not been apprised, the issue of state law may be settled by appropriate action on the part of the state to enforce obedience to the order. . . .
> In the absence of any showing that these obvious methods for securing a definitive ruling in the state courts cannot be pursued with full protection of the constitutional claim, the district court should exercise its wise discretion by staying its hands. . . .
> 312 U.S. at 501, 61 S.Ct. at 645.

These same considerations are extant in the case *sub judice*. As pointed out by defendants, plaintiff has available a clear state remedy as provided by the special Florida law relating to discharged Duval County teachers. In addition, he may fully pursue a libel or slander claim as well as a malicious or tortious interference with contract or prospective advantage claim against Kennedy and Galloway in the state courts. In addition, that the instant claim rests on an as yet determined question of state contract law has not been controverted by plaintiff in his response to the suggestion of abstention. Thus, the two main requirements of *Pullman*, (1) the presence of a substantial state claim which may be dispositive of the case in favor of plaintiff, and (2) the involvement of an unsettled question of state law, are present here.

The status of *Pullman's* precedential value has been fortified by the recent United States Supreme Court cases of Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970), and Askew v. Hargrave, 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971), which also involve factual situations somewhat dissimilar from the case at bar but which are clearly analogous in terms of the policy considerations involved. In *Reetz*, certain Alaska state fishing laws were challenged as violative of both the federal and state constitutions. The Supreme Court held that the federal district court should have abstained pending a state adjudication of the state constitutional questions. In *Hargrave*, the Court held that the federal district court should have stayed its hand in an equal protection challenge to the Florida Millage Rollback Law pending state resolution of accompanying state constitutional claims which would have obviated the need for determining the Fourteenth Amendment issue.[6]

Although *Reetz* and *Hargrave* involved factual situations where the claims presented involved questions of both state and federal constitutional law, the same policy considerations are just as applicable where the unsettled ques-

---

6. In passing, it should be noted that abstention has been deemed particularly appropriate in the criminal context. *See* Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971); Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971). *See also* Atlantic Coast Line R. Co. v. Engineers, 398 U.S. 281, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970).

tion of state law does not necessarily reach constitutional status, as in the instant case. As pointed out in City of Meridian v. Southern Bell Tel. & Tel. Co., 358 U.S. 639, 79 S.Ct. 455, 3 L.Ed. 2d 562 (1959), which was cited with approval in *Reetz, supra,* 397 U.S. at 85, 90 S.Ct. 788:

> Proper exercise of federal jurisdiction requires that controversies involving unsettled questions of state law be decided in the state tribunals preliminary to a federal court's consideration of the underlying questions . . . . That is especially desirable where the questions of state law are enmeshed with federal questions . . . . Here, the state law problems are delicate ones, the resolution of which is not without substantial difficulty—certainly for a federal court . . . . In such a case, when the state court's interpretation of the statute or evaluation of its validity under the state constitution may obviate any need to consider its validity under the Federal Constitution, the federal court should hold its hand, lest it render a constitutional decision unnecessarily. *Id.,* 358 U.S. at 640–641, 79 S.Ct. at 456.

It having been shown that abstention can be appropriate where the constitutional claim is *substantial,* it is *a fortiori* reasoning to apply it in a situation where the constitutional claim is debatable. In the light of two very recent cases from the United States Supreme Court and one from the Court of Appeals for the Fifth Circuit concerning public employment and procedural due process, it will become apparent that the constitutional claim presented in this case is certainly not clear and absolute, if not altogether unmeritorious. These cases are discussed below.

## III. PUBLIC EMPLOYMENT, PROCEDURAL DUE PROCESS AND ABSTENTION

In Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the plaintiff, a non-tenured assistant professor at a state university, who had been hired for a fixed term of one academic year, was informed that he would not be rehired for the next academic year. Under the university rules and because of his non-tenure status, he was not given any reason for the decision not to renew his contract nor was he given any opportunity to challenge the action at any sort of hearing. The probable reason for the non-renewal of his contract was that "he had publicly criticized the administration for suspending an entire group of 94 Black students without determining individual guilt. He also criticized the university's regime as being authoritarian and autocratic. He used his classroom to discuss what was being done about the Black episode; and one day, instead of meeting his class, he went to the Board of Regents." 408 U.S. at 579–580, 92 S.Ct. at 2710. (dissenting opinion) The Court did not feel that the deprivation of First Amendment freedoms to be sufficient in Roth to justify application of the traditional procedural due process safeguards of notice and an opportunity to be heard.

The reasoning of the Court was that the Fourteenth Amendment procedural due process requirements extended only to the protection of liberty and property. Roth's interest in being rehired constituted neither "liberty" nor "property". Roth was not deprived of an interest in "liberty" because the state did not impose on him any stigma or other disability which would operate to foreclose his freedom to pursue other employment opportunities. In addition, his non-tenure status did not assure him of a "property" interest in being rehired for the next year.

In the case at bar, although Norman alleges that he was stigmatized by reason of his dismissal from the alleged contract, he does admit that he obtained employment seven weeks later with the Greater Jacksonville Office of Economic Opportunity, which tends to indicate that he was not entirely foreclosed from future government employment. In ad-

dition, as to the existence of the "property" interest which he claims to possess by virtue of his annual contract, it has already been pointed out that there seems to be a genuine issue of unsettled state law as to whether a valid contract did exist.

In Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), another public employment-procedural due process case, the facts closely paralleled *Roth*, in that Sindermann, a non-tenured college teacher, was not rehired on the basis of criticism of the college governing board's policies without affording him notice of the reasons and an opportunity to refute them at a hearing. The difference in this case, however, was that there was evidence of the existence of a *de facto* tenure policy which would inure to the benefit of plaintiff therein. This *de facto* tenure system could constitute a sufficient "property" interest to come within the protection of procedural due process. On this basis, the lower court's finding of a violation of procedural due process was affirmed. The Supreme Court specifically rejected the notion that a mere subjective "expectancy" is protected by procedural due process. 408 U.S. at 603, 92 S.Ct. 2694. The question of whether Norman's interest in the alleged annual contract in the case at bar is a mere subjective "expectancy" or a "property interest" sufficient to invoke procedural due process will in turn depend on a question of state law, the determination of which this Court should not attempt prior to an authoritative state adjudication on the matter.

As persuasive authority that this particular case is peculiarly ripe for abstention, this Court need only cite Chief Justice Burger's concurring opinion in Perry v. Sindermann, *supra*, which is set forth below:

I concur in the Court's judgments and opinions in Perry and Roth, but there is one central point in both decisions that I would like to underscore since

it may have been obscured in the comprehensive discussion of the cases. That point is that *the relationship between a state institution and one of its teachers is essentially a matter of state concern and state law.* The Court holds today only that a state-employed teacher who has a right to re-employment under state law, arising from either an express or implied contract, has, in turn, a right guaranteed by the Fourteenth Amendment to some form of administrative or academic hearing on the cause for renewal of his contract. *Thus whether a particular teacher in a particular context has any right to such administrative hearing hinges on a question of state law.* The Court's opinion makes this point very sharply:

'Property interests . . . are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . .' Board of Regents v. Roth, 408 U.S. *ante* at 577 [92 S.Ct. 2701, at p. 2709]

Because the availability of the Fourteenth Amendment right to a prior administrative hearing turns in each case on a question of state law, the issue of abstention will arise in future cases contesting whether a particular teacher is entitled to a hearing prior to nonrenewal of his contract. *If relevant state contract law is unclear, a federal court should, in my view, abstain from deciding whether he is constitutionally entitled to a prior hearing, and the teacher should be left to resort to state courts on the questions arising under state law.* (emphasis added) 408 U.S. at 603–604, 92 S.Ct. at 2717.

Only a passing observation need suffice that the Fifth Circuit is completely in accord with the principles set forth above. In McDowell v. State of Texas, 465 F.2d 1342 (1971), *affirmed en banc* 465 F.2d 1349 (1972), the Fifth Circuit held that the superintendent of a state institution run by the Texas Board of

Mental Health and Mental Retardation was not entitled, as a non-tenured employee of the state, to an administrative hearing prior to a discharge for alleged "inefficiency, incompetency, and insubordination". This holding was affirmed *en banc* in the light of Perry and Roth. The facts in *McDowell* present a close parallel to the case at bar where similar charges of incompetency, inefficiency and insubordination have been raised. The following language in *McDowell* echoes that of Chief Justice Burger's concurring opinion and is completely dispositive here:

> If we were to distort §§ 1343 and 1983 to vest federal jurisdiction over the uniquely local substantive matters which this case presents, we would not only impair our ability to consider the vast array of cases that properly belong in federal forums but, as surely as sunrise, we create yet another and an unnecessary interference with orderly State processes.

> Only if a false vanity duped us into supposing that the quality of justice in the federal court system is somehow superior to that dispensed by the State, could we justify such an incursion into intrastate affairs. To the contrary, State courts are best equipped to determine the meaning and the scope of State statutes and local policies and to determine whether State officials encroached upon Dr. McDowell's rights of due process which are fully preserved in Texas courts by the Texas and the federal Constitution. 465 F.2d at 1346.

Therefore, it is

ORDERED:

1. This Court retains jurisdiction of this case pending resolution of plaintiff's claims under Florida law by the Florida state courts.

2. Proceedings in this case are stayed until further order of this Court.

3. Defendants' suggestion of abstention, filed herein February 23, 1973, is hearby granted.